## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION


**GEORGE RAYMOND JOHNSTON, III,**

      **Plaintiff,**

**vs.**                            **Case No. 4:11cv21-MP/CAS**

**GLENN E. YOUNG,**
**and OFFICER BOZEMAN,**

      **Defendants.**

_____/


## SECOND REPORT AND RECOMMENDATION[1]

      The discovery period in this case closed on November 23, 2012, and Defendants filed a motion for summary judgment on December 13, 2012. Doc. 98. The pro se Plaintiff filed his reply in opposition to the summary judgment motion on March 28, 2013. Doc. 104. Thereafter, after requesting leave of Court, Defendants filed a reply to Plaintiff's response, doc. 107, in April 2013, and in May, Plaintiff filed a sur-reply to Defendants' reply, doc. 109. The summary judgment motion is ready for a ruling.

---

[1] The first report and recommendation, doc. 75, granted in part the motion to dismiss, doc. 70. Plaintiff's claims against Defendants Edouard and Baldridge were dismissed for failure to exhaust administrative remedies, and Plaintiff's due process claims were dismissed for failure to state a claim. Docs. 75, 87. Plaintiff's First and Eighth Amendment claims continue against Defendants Young and Bozeman in their individual capacities only. *Id.*

As explained in greater detail below, Plaintiff has created a genuine dispute of fact as to the First Amendment retaliation claim and summary judgment cannot be granted in Defendant Young's favor on that claim. However, Plaintiff did not come forward with evidence to support the retaliation claim against Defendant Bozeman. Further, Plaintiff has not shown supported the Eighth Amendment claim and summary judgment should be granted in both Defendants' favor on that claim.

**Allegations of the Second Amended Complaint, doc. 23**

Plaintiff is a diabetic inmate who, in 2005, "suffered an: 'acute bilateral rupture of both quadracep tendons,' requiring immediate medical diagnosis, and treatment by urgent surgery to re-attach both tendons at the knees." Doc. 23 at 3. In November of 2008, when Plaintiff arrived at Madison Correctional Institution, the "laundry/security officer" issued him a pair of boots that was two sizes too small, and he was ordered to wear them despite his complaints. Doc. 23, p. 5. Plaintiff said his "diabetic feet were damaged by a constant lack of circulation." *Id.* at 5. Plaintiff contends the "laundry officers" ignored him and were "reckless." *Id.* After medical staff contacted laundry about the ill-fitting boots, in October 2009, "the laundry officer issued another pair of boots too small, and again ordered Plaintiff to 'wear em!' " *Id.* Plaintiff alleged the boots were extremely painful, and that Defendant Bozeman acted deliberately to save money. *Id.*

On December 30, 2009, "after numerous injuries and complaints, Plaintiff was issued an explicit medical pass for boots size (17) reg., due to the ongoing harm and damage to his diabetic feet." *Id.* at 6. Plaintiff contends Defendant Bozeman deliberately ordered size 18 EEE boots because they were cheaper, and threatened

Plaintiff to not complain anymore.  *Id.*  Plaintiff received the boots, now too large, on

January 5, 2010, despite his complaints and the issuance of the medical pass.  *Id.*

Plaintiff said they caused painful blisters on his feet.  *Id.*  Plaintiff again filed grievances

concerning this issue and nearly two months later Plaintiff "was issued a properly fitting

pair of boots" by Pride.  Within two weeks, however, Defendant Young ordered the

seizure of Plaintiff's boots "due to 'complaints' about prior sizes and injuries."  *Id.*

Defendant Bozeman seized Plaintiff's boots on March 31, 2010, but the very next day,

Pride issued Plaintiff "another pair of properly fitting boots, so [Plaintiff] could keep his

job at Pride."  *Id.*  Defendant Young then had Plaintiff immediately terminated from

Pride because of Plaintiff's grievances about the boots, and Plaintiff contends this act to

punish him was done in violation of his due process rights.  *Id.*, at 6-7.  Plaintiff was

transferred from Madison Correctional Institution to Avon Park Correctional Institution

on August 1, 2010, and as he was leaving, Defendant "Bozeman again seized

Plaintiff's" second pair of properly fitting boots.  *Id.*, at 7.

    Plaintiff contends that on December 18, 2010, he "sustained an injury that could"

have been avoided if Plaintiff's "boots had not been seized as reprisal, or had properly

fitting boots been issued."[2]  *Id.*  Plaintiff contends that he was not given prompt medical

treatment and was left for hours in "unbearable pain."  *Id.*[3]  Plaintiff alleged Eighth

---

[2] Plaintiff alleged he tripped and fell at 6:30 a.m. on December 18, 2010.  Doc. 23 at 4, 7.  Plaintiff contends the fall was "caused by . . . excessively large, and cumbersome ill-fitting boots."  *Id.* at 4.  Because Plaintiff is a diabetic, "any damage to the feet is critically dangerous" and becomes a serious medical need.  Doc. 23, p. 4.

[3] The remainder of the factual allegations concern Plaintiff's claims for inadequate medical care by Defendants Edouard and Baldridge.  Doc. 23.  As those claims and Defendants have been dismissed, there is no need to detail the remainder of the facts from the second amended complaint.

Amendment claims against Defendants Bozeman and Young concerning the issuance and seizure of Plaintiff's boots. Doc. 23 at 10-12. Although Plaintiff did not separately list a First Amendment retaliation claim against both Defendants, the factual statements reveal such a claim, and Defendants have addressed that claim in the summary judgment motion.

**Summary Judgment Standard**

On a motion for summary judgment Defendants initially have the burden to demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986). If they do so, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial. *Id*. An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted). Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Hickson Corp., 357 F.3d at 1260, *quoting* Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986). All reasonable inferences must be resolved in the light most favorable to the nonmoving party, Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999), if there is a genuine dispute as to those facts. Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769,

167 L.Ed.2d 686 (2007), *cited in* <u>Ricci v. DeStefano</u>, 129 S.Ct. 2658, 2677 (2009).

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Matsushita Elec. Industrial Co.</u>, 475 U.S. at 587 (internal quotation marks omitted), *quoted in* <u>Ricci v. DeStefano</u>, 129 S.Ct. at 2677.

**Rule 56 evidence**

**a.    Defendants' Evidence**

On November 21, 2008, Plaintiff was transferred to Madison Correctional Institution from the Department's Reception and Medical Center.  Doc. 98, Ex. A (doc. 98-1).  Plaintiff "was seen regularly" in the Chronic Illness Clinic ["CIC"] for "his condition of type 2 diabetes mellitus (Endocrine)."  Doc. 98, Ex. C[4] at 2, ¶5 (doc. 98-3 at 2).  On January 6, 2009, Plaintiff had a consultation with a nurse who noted in the medical records that Plaintiff was wearing size 15 boots.  *Id.* at ¶6; *see* Doc. 98, Ex. C at 9 (doc. 98-3).[5]  The nurse recommended Plaintiff wear size 16 to give his feet more room.  Doc. 98, Ex. C at 2, ¶6.

On January 26, 2009, Plaintiff was seen in the CIC by Physicians Assistant Mosley who noted Plaintiff had blisters on his feet due to the larger shoe size.  Doc. 98, Ex. C at 2, ¶6 (doc. 98-3).  Although the medical record is difficult to decipher, it appears that Plaintiff was complaining of pain in his feet.  Doc. 98, Ex. C at 11.  Ms. Mosley noted that Plaintiff had decreased sensation on his big toes.  *Id.*

---

[4] Exhibit C is an affidavit by Steven L. Harris, MD, explaining the medical records which are included as Exhibit 1, attached to Exhibit C.  Doc. 98, Ex. C (doc. 98-3).

[5] There is a notation in the record about Plaintiff's toes that is illegible, but the record confirms that Plaintiff had been wearing size 15 boots.  Doc. 98, Ex. C at 9.

Ms. Mosley wrote a Health Slip Pass[6] for Plaintiff to obtain "size 16 regular width boots."

Doc. 98, Ex. C at 2, ¶5.  In this situation, the pass would permit Plaintiff to obtain larger-

fitting shoes from the laundry.  Doc. 98, Ex. C at 2, ¶6 (doc. 98-3).  The pass was

written that same day, January 26th.  Doc. 98, Ex. C at 2, ¶7 (doc. 98-3); *see also* Ex. C

at 51.

During the relevant time period, Defendant Bozeman was assigned as the

laundry officer at Madison C.I.  Doc. 98, Ex. D at 1 (doc. 98-4).  Defendant Bozeman's

"responsibilities include issuing FDOC clothing to, and inventorying clothing from,

inmates housed at Madison C.I."  *Id.*  "Clothing includes boots and canvas shoes."  *Id.*

Defendant Bozeman submitted an affidavit stating that he does not recall the

specific boot size that was issued to Plaintiff when he first arrived at Madison C.I. in

2008.  Doc. 98, Ex. D at 2 (doc. 98-4).[7]  However, he does "recall that [Plaintiff] was

issued several different sized pairs of state boots in an attempt to find the boot size that

would fit him."  *Id.*  When Plaintiff reported "to the laundry with a Health/Slip Pass for

size 16 regular width boots at the beginning of 2009," Bozeman states that he

attempted to accommodate him.[8]  *Id.*  However, the "largest boot size stocked in the

---

[6] A Health Slip Pass "is a written authorization . . . from health services to the other institutional offices that will permit an inmate certain relief from a departmental or institutional requirement which affects a special medical problem."  Doc. 98, Ex. C at ¶6 (doc. 98-3 at 2).

[7] Defendant Bozeman advises that "[a]fter inmates are transferred from Madison C.I. to another institution, the clothing records are no longer retained."  Doc. 98, Ex. D, ¶4.

[8] As will be discussed ahead, it appears that 2009 was the first time Plaintiff obtained boots from Defendant Bozeman and Plaintiff did not do so in 2008 when he initially arrived at Madison.  *See* Doc. 107, Ex. D at 8.

laundry was size 15R," so Shoe Repair[9] was contacted to obtain the larger boot size. Doc. 98, Ex. D at 2, ¶6. Bozeman states he was able to obtain refurbished boots for Plaintiff, although he does not identify what size boots he obtained, and advises that he did not have authority to obtain new boot sizes. *Id.*

Defendant Bozeman states in his affidavit that Plaintiff's allegation that he intentionally refused to obtain boot sizes to properly fit Plaintiff is "absolutely untrue." Doc. 98, Ex. D at 1, ¶3 (doc. 98-4). Further, Defendant Bozeman flatly denies that he seized two pairs of boots from Plaintiff as retaliation. *Id.*

The medical records contain a notation as an "Incidental Entry" that on March 3, 2009, Plaintiff complained of foot pain, and he was "instructed on sick call procedures." Doc. 98, Ex. C at 12. The entry appears to state that Plaintiff "verbalized understanding," although the handwriting is not entirely clear. *Id.*

On July 29, 2009, Plaintiff was examined again by Ms. Mosley in the Chronic Illness Clinic who noted Plaintiff had good feet sensation, thick toe nails, and a toenail fungus. Doc. 98, Ex. C at 2, ¶8. Plaintiff was prescribed 500 mg per day of griseofulvin for the fungus. *Id.*

On October 21, 2009, Plaintiff submitted a request for a Good Adjustment Transfer, seeking to be transferred to Polk Correctional Institution, Avon Park Correctional Institution, or Lake Correctional Institution. Doc. 98, Ex. F (doc. 98-6). Plaintiff indicated on the request that his family lived in St. Petersburg, Florida. *Id.* The

---

[9] Madison Correctional Institution "has a Shoe Repair facility that repairs boots from all the institutions throughout the FDOC." Doc. 98, Ex. D at 2, ¶6. Thus, Madison had access to numerous boot sizes and could seek to accommodate Plaintiff. *Id.*

request was granted and Plaintiff's transfer was recommended by classification on October 28, 2009. Doc. 98, Ex. F at 2.

Plaintiff had a follow-up consultation with Ms. Mosley on October 28, 2009, concerning his "toenails." Doc. 98, Ex. C at 2, ¶9 (doc. 98-3); *see* Ex. C at 20. Mosley noted the thick, dark toe nail was growing out, the onychomycosis was improving, and directed the griseofulvin prescription to continue. *Id.*

On December 17, 2009, Plaintiff has a consultation with Nurse Denson for "eye irritation" and black toes. Doc. 98, Ex. C at 21. Denson noted Plaintiff had black toes from boots that were too small, and noted that his "great toes [were] severely harden from boots." *Id.* Plaintiff was provided antifungal cream and referred to P.A. Mosley again. Doc. 98, Ex. C at 2, ¶10 (doc. 98-3 at 2, 21).

Plaintiff saw Ms. Mosley on December 30, 2009, and the medical record indicates Plaintiff had calluses on the tips of his toes due to wearing small boots, which was indicated as size 16. *Id.* Mosley then recommended a larger size boot, size 17 regular width, and wrote a medical pass accordingly.[10] *Id.* The entry for that date also reflects "arch support." Doc. 98, Ex. C at 21.

Once again, Defendant Bozeman sought to obtain the larger size boot through Shoe Repair. Doc. 98, Ex. D at 2, ¶¶6-7. Bozeman states that he "attempted to accommodate him with the types of boots available through Shoe Repair." *Id.* at ¶7. Bozeman avers that he "did not intentionally provide him the incorrect boot size." *Id.*

---

[10] This was an increase from the prior recommendation of size 16 regular.

Sometime "after January of 2010," Plaintiff obtained a pair of 17 regular boots from Mr. Byrd and Mr. Vaughn, employees with PRIDE.[11]  Doc. 98, Ex. E at 6- 8 (excerpts from Plaintiff's deposition transcript).  However, Defendants submitted two affidavits from PRIDE employees Eric Byrd, doc. 98, Ex. H, and Ron Parker, doc. 98, Ex. G, who state that "PRIDE does not issue clothing to inmates" and only the Department "can issue clothing to inmates in their custody."  Doc. 98, Exhibits G, H, ¶¶2-3. (docs. 98-7, 98-8).  Those two affidavits also assert that while the PRIDE factory can fabricate boots, "the maximum size of boots that can be fabricated by PRIDE are size 15E boots."  *Id.*, ¶3.

Notwithstanding, the medical records indicate that Plaintiff submitted a grievance on or about February 25, 2010, indicating Plaintiff complained that he needed a different size boot.  Doc. 98, Ex. C at 24.  The record indicates Plaintiff "needs size 17 reg. width boot."  *Id.*  The grievance was denied, noting it was a "security issue" and stating that "medical does not order regular boots."  *Id.*

Sometime between January and March 2010, Lieutenant Seago conducted a routine search ("shakedown") of the PRIDE warehouse.  Doc. 98, Ex. D at 3 (doc. 98-4).  During this search, "a pair of refurbished boots were discovered at [Plaintiff's] work station" while Plaintiff was, "at the same time, working in PRIDE wearing another pair of

---

[11] PRIDE stands for Prison Rehabilitative Industries and Diversified Enterprises, Inc., and Plaintiff's job assignment during this time period was with PRIDE.  Doc. 98, Ex. F at 1.  Defendant Bozeman's affidavit asserts that "FDOC rules do not provide that PRIDE Corporation has authority to issue any type of clothing, such as boots, to any inmate. . . .  Doc. 98, Ex. D at 2 (doc. 98-4).  All clothing must be issued by the FDOC, purchased through the canteen, or it must be authorized by the Department to be brought or mailed into the Institution.  Doc. 98, Ex. D at 2.  Clothing not obtained through those methods is deemed contraband.  *Id.*  "Also, an inmate may only possess one pair of state issued footwear, either a pair of canvas shoes or a pair of boots."  *Id.*

boots.[12]  Doc. 98, Ex. D, at 3, ¶10; Doc. 98, Ex. E at 6 and 7.  Lt. Seago contacted

Defendant Bozeman in the laundry area who came to the PRIDE warehouse "to

confront [Plaintiff] regarding his possession of two pairs of boots."  Doc. 98, Ex. D at 3

(doc. 98-4).  Bozeman met with Plaintiff in Ron Parker's office, along with PRIDE

employees, Ron Parker[13] and Shannon Stephens.  *Id.*  Plaintiff "had in his possession

one pair of state issued refurnished boots and a second pair of smaller boots that he

was wearing."  *Id.*  Bozeman is unaware how Plaintiff obtained the second pair of boots

he was wearing, "but his possession of those boots was contrary to FDOC rules."  *Id.*

Although Bozeman could have written Plaintiff "a disciplinary report for possession of a

contraband second pair of boots," he allowed Plaintiff to choose the pair of boots he

wanted to keep.  *Id.*  Plaintiff chose the smaller pair of boots.[14]  *Id.*

Plaintiff's medical records contain a notation on January 29, 2010, that Plaintiff

had "good sensation" in his feet.  Doc. 98, Ex. C at 3, ¶11 (doc. 98-3).  However, on

February 8, 2010, Plaintiff filed an informal grievance asserting he was getting blisters

from boots issued by the laundry officer.  Doc. 98, Ex. I at 1 (doc. 98-9).  Plaintiff stated

that Ms. Mosley had issued a pass for Plaintiff to have size 17 regular work boots, but

instead, the laundry officer "ordered and delivered to [Plaintiff] a size 18 EEE" pair of

boots which Plaintiff complained was "way too large for" him.  *Id.*  Plaintiff complained

he was getting blisters and asked to have the pass re-issued for a size 17 regular width

---

[12] Inmates are allowed to possess only one pair of state issued boots.  FLA. ADMIN. CODE R. 33-602.201(4)(a).

[13] Parker is employed by PRIDE at Madison C.I.  Doc. 98, Ex. G (doc. 98-7).

[14] "The Department of Corrections does not permit inmates to possess two pairs of state issued footwear."  Doc. 107 at 6, *citing* doc. 98-4, ¶8 (Bozeman affidavit).

boot.  *Id.*  The informal grievance was denied, and the response advised that Plaintiff did "not need medical shoes [Plaintiff] just need[ed] a larger size."  *Id.*  Plaintiff was told that all boots were "issued through the laundry even if they are larger size boots" and Plaintiff was directed to refer his request to security.  *Id.*

On February 12, 2010, Plaintiff filed a formal grievance in which he complained that after arriving at Madison, he was given a size 15 boot because that "was all that was available" although Plaintiff wears a size 16 boot.  Doc. 98, Ex. I at 2 (doc. 98-9).  Plaintiff said that after a medical examination, a medical order was issued for Plaintiff to have the proper size boots.  *Id.*  Plaintiff said that he was improperly given "a very old worn out pair of size (17) EEE boots and again ordered to wear them . . . ."  *Id.*  Plaintiff reported having issues with his "diabetic feet due to said boots" and said once again, a medical order was issued for Plaintiff to have the proper size boots.  *Id.*  Plaintiff complained that he had a "loss of the toenails on both feet due to the toes constant rubbing against the front top of said boots."  *Id.* at 3.  Plaintiff also reported that he had developed a foot fungus due to the "moldy old boots."  *Id.*  That grievance was "returned without action" by Defendant Young[15] on March 23, 2010, because Plaintiff had not followed grievance rules.  *Id.* at 4.

---

[15] Defendant Young is currently assigned as the Assistant Warden of Operations at Madison Correctional Institution, but during the relevant time frame, was the Assistant Warden of Programs (AWP).  Doc. 98, Ex. J (doc. 98-10 at 1).  The AWP's "responsibilities include serving as the Institution Grievance Coordinator and supervising classification, education, vocations and wellness . . . ."  *Id.* at ¶¶1-3. Plaintiff's first formal grievance was returned because Plaintiff "improperly used multiple copies of form DC1-303 for his continuation pages contrary to the grievance rules." Doc. 98, Ex. J at 2, ¶6.

Plaintiff filed a second formal grievance on March 12, 2010. Doc. 98, Ex. I at 5-7 (doc. 98-9). As the Institutional Grievance Coordinator, Defendant Young was to review and approve responses of formal grievances. Doc. 98, Ex. J at 2 (doc. 98-10). Staff investigate a grievance and prepare a response which is submitted to Defendant Young "for final review and approval." *Id.* The investigation revealed Plaintiff had been issued "five different pairs of state boots for over a year in multiple attempts to provide him with boots that he would be satisfied with." *Id. at ¶7.* "These boots were not issued to him because he was diabetic, but to attempt to find boots that did not rub his feet." *Id.* Young was aware that between January and March 2010, Plaintiff had been discovered with two pair of boots and he had been allowed to chose the pair of boots he wanted to keep. *Id.* Plaintiff chose a pair and said "they fit fine." *Id.* However, Plaintiff's formal grievance dated March 12, 2010, still complained about "the boots he had chosen." *Id.* Staff determined that because several attempts had already been made unsuccessfully to obtain satisfactory boots for Plaintiff, that there were no boots with which Plaintiff would be satisfied. *Id.* Young avers that "security decided to try to issue him a pair of canvas shoes and to change his job assignment where boots were not required." *Id.*

Defendant Young states in his affidavit that the results of that investigation were included in the response to Plaintiff's second formal grievance.[16] Doc. 98, Ex. J at 2 (doc. 98-10). Young declares that it was not his decision to issue Plaintiff the canvas shoes and change his job assignment; those decisions were made by other staff. *Id.*

---

[16] The response stated that Plaintiff would be provided "a pair of State tennis shoes (size 17)" and not boots. Doc. 98, Ex. I (Doc. 98-9 at 7). The response, dated March 30, 2010, also stated that "[d]ue to the change in shoes, you will be receiving a job change that does not require you to wear boots." *Id.*

Young states that the Institutional Classification Team, comprised of Luther Polhill, Brian Parker, and Major Capps, made that decision based on institutional need. *Id.* at 3, *citing* Exhibit 2 (doc. 98-10 at 4-7).[17] Nevertheless, Young states that he "would have considered changing the job assignment for additional reasons." Doc. 98, Ex. J at 3 (doc. 98-10). For example, it appears that Plaintiff "either obtained a pair" of boots from PRIDE staff or Plaintiff "stole a pair from the PRIDE warehouse." *Id.* If Plaintiff "had improperly obtained the boots from either means, such improper conduct could not be ignored." *Id.*

Defendant Young advises that although the decision had already been made to change Plaintiff's job assignment, he "informally discussed" Plaintiff's position in PRIDE with Ron Parker, a PRIDE employee. Doc. 98, Ex. J at 3 (doc. 98-10). Young recalls that Parker indicated Plaintiff "was not the type of worker that was irreplaceable." *Id.* Parker, a PRIDE employee, states that Plaintiff "was an average worker and was not hard to replace." Doc. 98, Ex. G, ¶4 (doc. 98-7). Defendant Young asserts in his affidavit that he took that extra step to ensure the job re-assignment was correct and not out of retaliation. Doc. 98, Ex. J at 3 (doc. 98-10). Plaintiff's job assignment was changed from PRIDE to houseman on April 1, 2010. *Id.* at 3, ¶9.

Defendant Bozeman states in his affidavit that in early April 2010, he was informed that Plaintiff's job had been changed to houseman and "in order to accommodate his large foot size, canvas shoes would be provided to him." Doc. 98,

---

[17] That Exhibit is the Institutional Classification Team Docket for April 1, 2010, which transferred Plaintiff's job assignment from PRIDE "to Houseman."

Ex. D at 3, at ¶11 (doc. 98-4). "PRIDE[18] provided the size 17 canvas shoes to the laundry to issue to" Plaintiff. *Id.* Bozeman states in his affidavit that he did not take the boots away from Plaintiff "to harm him, but instead was directed to provide him the canvas shoes to accommodate his need for a larger size because [Plaintiff] was not satisfied with the various types of boots that were issued to him." Doc. 98, Ex. D at 3, at ¶11 (doc. 98-4).

Plaintiff appealed the response on his formal grievance by filing an appeal with the Secretary's Office on April 9, 2010. Doc. 98, Ex. I at 8-14 (doc. 98-9). The appeal was denied on April 23, 2010, finding the response provided to Plaintiff appropriately addressed Plaintiff's concerns. *Id.* at 15. Further, the response advised that Plaintiff's "allegations concerning the boots and reprisal appear to be unfounded." *Id.*

On or about April 20, 2010, Plaintiff "was again discovered with a pair of boots that were not properly issued to him." Doc. 98, Ex. D at 3, ¶12 (doc. 98-4). When Defendant Bozeman observed Plaintiff with the boots, he consulted with his supervisor concerning the matter. *Id.* Defendant Bozeman states that although the boots could have been confiscated, "the decision was made to permit him to wear the boots at that time." *Id.* Thereafter, Plaintiff was allowed to wear the boots while housed at Madison C.I. *Id.*; Doc. 98, Ex. D at 3, ¶12.

On April 21, 2010, and April 22, 2010, Plaintiff filed two more grievance appeals concerning the ill-fitting boots. Doc. 98, Ex. I at 16-34 (doc. 98-9). Those appeals were both denied. The first response, dated May 10, 2010, advised that Plaintiff had the

---

[18] Bozeman also advised that "PRIDE at Madison C.I. distributes the canvas shoes from the manufacturer to all the FDOC institutions, so they had immediate access to this type of shoe size." Doc. 98, Ex. D at 3 (doc. 98-4).

correct sized boots.  *Id.* at 25.  The second response, dated June 2010, advised that

Plaintiff had already presented the issue in prior grievances.[19]  *Id.* at 34.

On July 30, 2010, Plaintiff was transferred from Madison C.I.  Doc. 98, Ex. A; Do.

98, Ex. D at 4 (doc. 98-4).  Pursuant to FDOC Procedure No. 602.046(1)(a), an inmate

is issued "one (1) pair of canvas shoes or one (1) pair of work boots (if necessary . . . .)"

Doc. 98, Ex. K at 3 (doc. 98-11).  That Procedure also states that "[w]ork boots will be

transferred with inmate <u>only</u> if the inmate has a medical authorization requiring that they

be worn at all times."  *Id.*  Further, inmates are "transferred with only one (1) type of

state issued footwear; either canvas, work boots,[20] or medically necessary therapeutic

shoes . . . ."  *Id.; see also* Procedure No. 602.046(7).[21]  Doc. 98, Ex. K at 5 (doc. 98-11).

 Defendant Bozeman states that when Plaintiff was transferred, the boots he had been

permitted to wear "were inventoried in accordance to FDOC rules."  Doc. 98, Ex. D at 4

(doc. 98-4).  Plaintiff was "only allowed to possess one set of state issue clothing,

including only one pair of canvas shoes."  Doc. 98, Ex. D at 2, 4.[22]  Defendant

Bozeman's affidavit emphasizes the fact that Procedure No. 602.046 only allows an

exception from the canvas shoes only rule "if the inmate has a medical authorization

---

[19] The medical records also contain a notation concerning that grievance.  Doc. 98, Ex. C at 28.

[20] That Procedure provides that "[i]nmates assigned to a work assignment that requires additional foot support or protection will be issued a work boot that is suitable for the work assignment."  Doc. 98, Ex. K at 3 (doc. 98-11).

[21] That subsection states that male inmates are transferred wearing "one (1) pair of appropriate footwear."  Doc. 98, Ex. K at 5.

[22] Defendant Bozeman states in his affidavit that "an inmate may only possess one pair of state issued footwear, either a pair of canvas shoes or a pair of boots."  Doc. 98, Ex. D, ¶8.

requiring that [work boots] *be worn at all times*." Doc. 98, Ex. D at 4, ¶14 (emphasis in original). Defendant Bozeman states that Plaintiff's medical pass did not indicate "that the boots were to be worn at all times, so [Plaintiff] was issued a pair of canvas shoes in accordance with procedure." *Id.* at ¶16.

Plaintiff's Health Information Transfer/Arrival Summary is dated July 29, 2010, and August 10, 2010, indicating Plaintiff was held in "CFRC" before arriving at Avon Park Correctional Institution. Doc. 98, Ex. C at 30 (doc. 98-3). The form indicated Plaintiff's "current medical, dental, or mental health complaint" concerned a "pass for work boots" and that Plaintiff did "not have boots." *Id.* at 31.

While Plaintiff was at Avon Park Correctional Institution, he submitted an inmate request dated September 16, 2010, indicating he had a "Diabetic Medical Health Slip Pass for work boots size 17 issued from 12-10-09 to 12-10-10." Doc. 98, Ex. L at 1 (doc. 98-12). Plaintiff said that his "Bobos[23] [were] worn out, but more importantly they provide no ankle support." *Id.* The response approving his request stated that on September 21, 2010, Plaintiff was "issued size 18 boots until [his] size can be ordered." *Id.* Plaintiff submitted another request on October 8, 2010, indicating he was "still wearing the size 18 EEE boots that are much too large" and stated he wears "a size 16 Regular, and [has] a Medical Health Slip Pass for size 17 Regular boots." *Id.* at 2. Plaintiff said he was waiting patiently for the proper sized boots. *Id.* The response, dated October 18, 2010, stated that his size 17 boots had been ordered, and reminded Plaintiff he "agreed to continue wearing the size 18 boot[s] that were issued." *Id.*

---

[23] The canvas shoes issued by the Department are often referred to as "Bobos." Doc. 107, Ex. D at 13 (doc. 107-4).

On December 18, 2010, Plaintiff reported that he fell on the way to breakfast and suffered a tendon tear in his left knee. Doc. 98, Ex. C at 42 (doc. 98-3). A note on the record is that his boots appeared to be too large and "may have contributed to fall." *Id.*

The affidavit by Steven L. Harris, MD, explaining the medical records states that except for finding "blisters and toe calluses, the medical records do not show conditions related to shoe or boot size." Doc. 98, Ex. C at 3, ¶12 (doc. 98-3). Further, Dr. Harris declares "there is no notation in the medical records regarding loss of toenails." *Id.* at 2. The medical records do, however, reflect that on December 17, 2009, Plaintiff "had a consultation with Nurse Denson for black toes from small boots." *Id.* On December 30, 2009, Plaintiff saw Ms. Mosley who indicated Plaintiff "had calluses on the tips of his toes due to small boots" and issued Plaintiff a medical pass for a larger size boot. *Id.* After a January 29, 2010, entry in the medical record that Plaintiff had "good feet sensation," Dr. Harris states that there are no other medical consultations referencing Plaintiff's feet, "other than references that his toe nails were growing, which required toe nail trimming." *Id.* at 3. Dr. Harris states there are "no references to feet or footwear issues after [Plaintiff] was transferred from Madison" C.I. until Plaintiff reported tripping on December 18, 2010. *Id.* Dr. Harris advises that Plaintiff's diabetes increases his susceptibility to a toe nail fungus, which would not be related to boots, generally, but "would result from an inability for his feet to completely air out when he was not wearing the boots." *Id.* at 3. "Canvas tennis shoes would have also facilitated his feet to air out." *Id.* Dr. Harris declares that Plaintiff's "medical records do not show that the boot size changes were due to [Plaintiff's] diabetes." Doc. 98, Ex. C at 3, ¶14 (doc. 98-3). The first medical pass issued for Plaintiff to have a larger boot size was due to blisters,

and the second pass was issued for calluses due to short boots. *Id.* Dr. Harris advises

that "[b]listers and calluses are common occurrences in all humans, regardless of shoe

fittings." *Id.*

b.      **Plaintiff's Evidence**

Plaintiff submitted his own sworn statement[24] pointing out that he needed boots

for "ankle support" as well as "to protect Plaintiff's diabetic feet from injury based upon

his well documented diabetic predisposition." Doc. 104 at 4, *citing* to Defendant's Ex.

C, Ex. 1 (doc. 98-3 at 51). Plaintiff asserts that on the face of both Health Slip/Passes[25]

issued, "ankle support" is clearly written. *Id.* Plaintiff states that his "prior acute bi-

lateral rupture of both his quadracep tendons . . . combined with his weak and damaged

ankles" required the ankle support. Doc. 104 at 4.

Plaintiff's statement advises that in November 2008, he was issued a pair of

boots "two (2) sizes too small, despite his having been informed of Plaintiff's need for

size appropriate boots." Doc. 104 at 5.[26] In October 2009, Plaintiff states that

---

[24] Plaintiff's response to summary judgment is sworn under penalty of perjury and is sufficient to stand as Plaintiff's sworn declaration. Doc. 104 at 2, 38.

[25] On the pass written by Mosley for December 2009 through December 2010 is the notation "boot size 17 regular width" and it appears to say "arch support," not ankle support. Doc. 98, Ex. C at 51 (Doc. 98-3); *see also* Doc. 107 at 5; Doc. 107, Ex. H. A Declaration by Ms. Mosley clarifies that Plaintiff was "issued a pair of arch support inserts for inside the boots, which are noted on the pass." Doc. 107, Ex. H (doc. 107-8). The earlier pass, written for January 26, 2009, through January 26, 2010, for boot size 16 regular width also includes the notation "arch support." Doc. 98, Ex. C at 51 (Doc. 98-3); *see also* Doc. 107 at 5; Doc. 107, Ex. H.

[26] In reply, Defendants assert that the laundry officer at Madison Correctional Institution in November 2008 "was not a defendant in this action." Doc. 107 at 6; doc. 107, Ex. D (doc. 107-4 at 7-8). In Plaintiff's deposition he stated that the laundry officer in 2008 is unknown and not included in this case. Doc. 107, Ex. D at 7-8 (doc. 107-4).

Defendant Bozeman issued him a pair of boots that were too small. *Id.* at 6. After

Ms. Mosley issued Plaintiff a pass on January 26, 2009, Plaintiff declares that

Defendant Bozeman "refused to honor" the pass and issued Plaintiff "the wrong size

triple (EEE) boots which were much too wide for Plaintiff's feet causing further

damage." *Id.* In January 2010, Plaintiff said that Defendant Bozeman delivered him a

"pair of size 18 (EEE) boots" and after being advised of the mistake, Plaintiff said that

Bozeman "ordered Plaintiff to 'try them out because that is all we can get.' " *Id.* at 28.

Plaintiff has pointed to evidence demonstrating that Defendant Bozeman was

aware that Plaintiff "had a health/slip pass indicating a boot size." Doc. 104, Ex. C at

24 (doc. 104-1). Plaintiff's sworn declaration states that on December 30, 2009,

"Physicians Assistant Lourdes Mosley contacted Defendant Bozeman by telephone

with Plaintiff present, and explicitly informed him of Plaintiff's medical need for a size 17

regular width boots, which he would wear at all times to avoid further damage to his

feet." Doc. 104 at 7. Contrary to that assertion, Defendant Bozeman's answer to

Interrogatory 2 states that Bozeman does "not recall being contacted by medical staff

regarding [Plaintiff's] need for specific size of boots." Doc. 104, Ex. C at 1 (Doc. 104-1

at 23). Plaintiff said he "continued wearing the size 16 (EEE) boots while Bozeman

placed a deliberate order for size 18 (EEE) boots." Doc. 104 at 8.

Plaintiff contends that "[b]ecause no relief from the ongoing injuries was

forthcoming," he had to file a formal medical grievance on February 12, 2010,

"documenting the extremely painful 'loss of the toe nails on both feet due to the toes

constantly rubbing against the front top of said boots.' " Doc. 104 at 9. Plaintiff

contends that his medical records reference the fact that his "toe nails grew back

grossly deformed and 'thick' with an unsightly discoloration and permanent numbness of the Plaintiff's toes." Doc. 104 at 9, 10, *citing* doc. 98, Ex. C, ¶8, and Ex. 1 at 13. Plaintiff asserts that the loss of toe nails on both feet was "extremely painful" and he "still suffers from discoloration and permanent numbness of his toes." Doc. 104 at 10.

Plaintiff states that he has an inmate witness (inmate Schwagler) who will testify at trial that Defendant "Bozeman purposely ignored the medical pass because the size 18 (EEE) boots were easier to acquire, and were cheaper than ordering the correct size." Doc. 104 at 8.[27] Plaintiff states in his declaration that when he was given a pair of boots in November 2008 that were two sizes too small, he "immediately made the Officer aware of the error, and was falsely told 'it was all that was available." Doc. 104 at 5. Plaintiff asserts Defendant Bozeman knew of his medical need for the boots, had

---

[27] Pursuant to Rule 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." FED. R. CIV. P. 56(d). Plaintiff declares that he must have a court order and special permission from the wardens at both Correctional Institutions for Plaintiff to communicate with the inmate witness to obtain his written declaration. Doc. 104 at 8. That is correct, although Plaintiff has never requested permission from this Court to contact another inmate to obtain a sworn statement. "The general rule is that inadmissible hearsay cannot defeat a motion for summary judgment where there is no indication that it is reducible to a form that would be admissible at trial." Wyant v. Burlington Northern Santa Fe Railroad, R. C., 210 F.Supp.2d 1263, 1275 (N.D. Ala. 2002) (quoting Pritchard v. Southern Co. Services, 92 F.3d 1130, 1135, amended in part on rehearing, 102 F.3d 1118 (11th Cir. 1996), *cert. denied*, 520 U.S. 1274, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997). Plaintiff's affidavit contains hearsay as it relates the statement communicated by inmate Schwagler to Plaintiff. To the degree Plaintiff contends that inmate Schwagler, as Defendant Bozeman's laundry orderly, has personal knowledge of the facts stated and could testify to those facts at trial or at least present a sworn affidavit attesting to these facts, this statement may be considered in ruling on Defendant's summary judgment motion, accepting that Plaintiff could properly support the statement should this case go to trial.

"the appropriate size available, and failed to respond in accordance with medical directives." *Id.* at 6.

Plaintiff further contends that Defendant Bozeman ordered him to wear the inappropriate footwear, or face disciplinary action for disobeying an order. *Id.* Specifically, Plaintiff relates that after Ms. Mosley's telephone call, he was "ordered by medical staff to take a copy of his pass to laundry to that laundry would have a copy on file." *Id.* at 7. "Upon his arrival, Plaintiff was threatened with solitary disciplinary confinement for getting medical involved." *Id.* Plaintiff states that Defendant Bozeman "refused to honor, or adhere to the medical health Slip/Pass, and continued to issue Plaintiff the wrong size triple (EEE) boots which were too wide for Plaintiff's feet causing further damage." *Id.* at 6. Plaintiff contends Defendant was deliberately indifferent "because the proper sized boots were always available." *Id.* Plaintiff points to Defendant Bozeman's answer to Interrogatory number 7 which asked: "Was it possible for Defendant Bozeman to procure the size boots designated in Plaintiff's valid medical pass?" Doc. 104, Ex. C at 24. Defendant Bozeman's answer was: "Yes. The boot size on the health/slip pass could be obtained." *Id.*

Plaintiff asserts that during one conversation with Defendant Bozeman, "Plaintiff was given a choice of which injurious pair of boots he would rather wear, between the size 18 (EEE) or the size 16 (EEE). Doc. 104 at 12. Plaintiff "chose the boots which created the least pain and negative side effects, and kept the old worn out size (16) EEE which" Plaintiff said made him lose his toe nails and turned his toes black. *Id.* Plaintiff further said that Defendant Bozeman failed to take the other shoes back, and

Plaintiff was given permission (although he does not say by who) to "leave the size 18 (EEE) boots beside his work station." Doc. 104 at 28.

Plaintiff asserts that his PRIDE supervisor, Mr. Vaughn, "acted as a go between" and went to the Madison Boot Repair "and had the Boot Repair/Security Staff issue Plaintiff a pair of properly fitting size 17 regular width boots in accordance with his medical Health Slip/Pass." Doc. 104 at 15. Plaintiff said Mr. Vaughn "called over to Madison Boot Repair and found that there were several pairs of size 17 (reg.) available." *Id.* at 28. Plaintiff asserts the boots were not issued or provided by PRIDE as PRIDE's capacity is limited to shoe sizes 7 through 15. *Id.* at 15. Plaintiff contends that after Mr. Vaughn provided him the shoes, Plaintiff's issues were resolved until Defendant Young directed Defendant Bozeman to seize Plaintiff's shoes after Plaintiff filed the grievance. *Id.* Plaintiff also submitted Defendant Young's answers to Plaintiff's interrogatories. Doc. 104, Ex. A (doc. 104-1 at 10). Interrogatory 23 asked, "Was Defendant Young ever aware of the Pride Corp. supervisors providing Plaintiff with properly fitting boots?" The answer stated:

> Yes. Staff at PRIDE provided at least one pair of boots to inmate Johnston, but such actions were against FDOC procedure because only the FDOC provides clothing to inmates by issuing the clothing through the laundry. PRIDE is a private contractor and does not have the authority to issue or provide clothing to inmates.

Doc. 104, Ex. A at 5 (doc. 104-1 at 10).

Plaintiff challenges Defendants' contention that Plaintiff was allowed to wear the boots which were, in essence, contraband. Doc. 104 at 18. Plaintiff contends that such fact is "indicative that the boots were not stolen or contraband, nor considered as contraband" as such property would be required by Rule 33-602.203(8)(c) to be taken

from Plaintiff and "returned to the institutional supply source if reusable."  Doc. 104 at 18.

Plaintiff also disputes Defendant Young's assertion that the decision to remove Plaintiff from his job with PRIDE was made by the ICT.  Doc. 104 at 19.  In particular, Plaintiff asserts that Defendant Young responded to the grievance on March 30, 2010, which was two days before the ICT meeting.  *Id.* at 19-20.  Furthermore, Plaintiff states that his work boots were taken by Defendant Bozeman on March 31, 2010, as ordered by Defendant Young, which was also prior to the ICT meeting on April 1st.  *Id.* at 19. Plaintiff contends that contrary to Defendants' assertion that he had a poor job performance at PRIDE, Plaintiff had "been given a promotion by Mr. Byrd, [his] supervisor for outstanding job performance at PRIDE."  *Id.*  Thus, Plaintiff states that the reasons asserted for Plaintiff's removal from PRIDE and the taking of his boots are "a ruse."  *Id.* at 20.  His affidavit suggests that his removal from PRIDE was punishment for having submitted grievances.  *Id.* at 11-12.  Plaintiff contends "Defendant Young failed to gain, or even attempt to gain any medical approval to over-ride and cancel Plaintiff's valid medical pass, and admitted in his Declaration."  *Id.* at 21; *see also* doc. 104, Ex. A at 3 (doc. 104-1 at 8).

Plaintiff states that when he went to the ICT callout on April 1, 2010, he advised that his issue with the boots had been resolved and, according to Plaintiff, he still had his boots.[28]  Doc. 104 at 22.  Plaintiff requested that he return to PRIDE, but was informed that the Colonel would make that decision.  *Id.*  Plaintiff submitted an inmate

---

[28] Plaintiff said he "had no further issues, or problems with [his] new boots" and claimed he had "the proper size and perfectly fitting work boots."  Doc. 104 at 22.

request on April 18, 2010, requesting that he be returned to PRIDE because he had been given "proper work boots." Doc. 104, Ex. H. That request was denied and Plaintiff was advised that his request would "not be considered at this time." *Id.* An informal grievance dated April 27, 2010, seeking to be returned to his PRIDE job was denied on May 5, 2010. Doc. 104, Ex. I. Plaintiff was told that "job assignments [were] based on institution need and you are currently needed as a houseman." *Id.*

Plaintiff submitted an inmate request dated June 8, 2010, in which Plaintiff asked to come back to work for PRIDE. Doc. 104, Ex. M (doc. 104-1 at 78). Ron Parker stated that PRIDE would approve the request for reassignment, but stated that "ICT [would] have to approve, before" Plaintiff could be reassigned. *Id.* Plaintiff submitted another inmate request to Defendant Young on June 14, 2010, requesting that he be returned to PRIDE. Doc. 104, Ex. L. Defendant Young responded that "Mr. Parker in PRIDE was contacted and [Plaintiff's] performance was satisfactory." *Id.* Plaintiff was advised that the "ICT [would] review [Plaintiff's] current job performance and a recommendation for a job assignment made." *Id.*

Plaintiff clarifies that he was transferred to Avon Park Correctional Institution on the good adjustment transfer on August 1, 2010. Doc. 104 at 25. Defendant Bozeman "seized Plaintiff's properly fitting and medically authorized size 17 (reg.) boots" before Plaintiff left Madison C.I. *Id.* Plaintiff contends that the "inappropriate boots issued" to him by Defendant Bozeman "permanently disfigured Plaintiff's toe nails, which continue to grow deformed, discolored, unsightly, and unusually thick with a rancid smell as a result of the damage caused by the fungus." *Id.* at 25-26.

c.    **Defendants' Reply, doc. 107**[29]

Defendants submitted the Declaration of Lourdes Mosley, P.A., who was

employed by the Department of Corrections and was assigned to Madison C.I. in 2009.

Doc. 107, Ex. H (doc. 107-8).  She states that the wrote the January 26, 2009, "pass for

size 16 regular width boots to address blisters on [Plaintiff's] feet."  *Id.*  Further, she

advises that the December 2009 pass for size 17 regular width boots was "to address

calluses on the tips of his toes."  *Id.*  Further, Ms. Mosley points out that Plaintiff was

provided "arch support" inserts and that was noted on both of the passes.  *Id.*

Defendants also provided additional transcript pages from Plaintiff's deposition.

Doc. 107-4.  Plaintiff discussed that when he arrived at Madison C.I. in 2008, he was

given property from the laundry officer, but he does not "recall exactly who the laundry

officer was at that point" and does not know the identity of that officer.  Doc. 107, Ex. D

at 8 (Doc. 107-4).  Plaintiff said the "officer was not included in this case because the

officer is unknown."  *Id.*

**Analysis**

**A.    Eighth Amendment claim**

Defendants argue that Plaintiff's Eighth Amendment claim lacks merit because

Plaintiff did not have a serious medical need and he suffered only from blisters,

calluses, and a toenail fungus.  Doc. 98 at 13-15.  Defendants' argument, however, is

---

[29] Much of the Reply concerns argument addressing Plaintiff's contention that
Plaintiff was not provided medical records, that he could not obtain a statement from
inmate Schwagler, that he was denied access to his deposition, and other matters not
relevant to disputed issues of material facts.  Doc. 107.  There is no need to address
those arguments, nor Plaintiff's arguments as presented in the sur-reply, doc. 109.  The
time to address discovery issues was during the discovery period.

based on the standard for considering a claim that Plaintiff failed to receive appropriate medical treatment.  Doc. 98 at 13-14.  That is not the proper standard because the surviving claims against Defendants Young and Bozeman are not claims for the denial of medical care because these Defendants are not medical professionals but prison officials.[30]  Rather, Plaintiff's claims concern the conditions of his confinement and assert that Defendants interfered with a "Health/Slip Pass" issued by a medical professional for specific sized boots and did so intentionally for the purpose of causing Plaintiff pain and discomfort.  Plaintiff's claims against Defendants Bozeman and Young contend they were deliberately indifferent "to Plaintiff's 'basic human need' and 'serious medical need' for properly fitting boots" and "created an unsafe and dangerous condition, which created Plaintiff's multiple injuries, constituting 'cruel and unusual punishment' under the Eighth Amendment . . . ."  Doc. 23 at 11.  Plaintiff further asserted that he was deprived of a "basic human need for boots" when Defendants ignored the medical pass and took away his boots.  *Id.*  Due to the fact that Plaintiff is diabetic, problems with his feet are considerably more serious than would be the case for a non-diabetic person.[31]

> In the prison context, three distinct Eighth Amendment claims are
> available to plaintiff inmates alleging cruel and unusual punishment, each
> of which requires a different showing to establish a constitutional violation.
> *Danley v. Allen*, 540 F.3d 1298, 1306 (11th Cir. 2008), overruled in part on

---

[30] While Plaintiff's complaint did assert claims for the denial of medical care, doc. 23 at 11-12, those claims are based on events dating from December 18, 2010, and following.  Plaintiff's claims against Dr. Edouard and Captain Baldridge were previously dismissed.

[31] Notwithstanding that having a serious medical need is not an element of an Eighth Amendment conditions of confinement claim, diabetes is a serious medical condition.

other grounds, *Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010). The
Eighth Amendment can give rise to claims challenging specific conditions
of confinement, the excessive use of force, and the deliberate indifference
to a prisoner's serious medical needs. *Id.* Each of these claims requires
a two-prong showing: an objective showing of a deprivation or injury that
is "sufficiently serious" to constitute a denial of the "minimal civilized
measure of life's necessities" and a subjective showing that the official
had a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S.
825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994) (internal citations
and quotations omitted).

Thomas v. Bryant, 614 F.3d 1288, 1303-04 (11th Cir. 2010). Accordingly, "what is

necessary to show sufficient harm and what is necessary to show a sufficiently culpable

state of mind varies with the type of Eighth Amendment claim at issue." Thomas, 614

F.3d at 1304, *citing* Hudson v. McMillian, 503 U.S. 1, 8-9, 112 S.Ct. 995, 1000, 117

L.Ed.2d 156 (1992).[32]

"[W]hen the State by the affirmative exercise of its power so restrains an

individual's liberty that it renders him unable to care for himself, and at the same time

fails to provide for his basic human needs--e.g., food, clothing, shelter, medical care,

and reasonable safety--it transgresses the substantive limits on state action set by the

Eighth Amendment. . . ." Helling v. McKinney, 509 U.S. 25, 31-32, 113 S. Ct. 2475,

2480, 125 L. Ed. 2d 22 (1993), *quoting* DeShaney v. Winnebago Cnty. Dep't of Soc.

Servs., 489 U.S. 189, 199-200, 109 S. Ct. 998, 1005-1006, 103 L. Ed. 2d 249 (1989);

---

[32] In Hudson, the Supreme Court explained that the objective component of an
Eighth Amendment claim is "contextual and responsive to 'contemporary standards of
decency,'" and generally, "extreme deprivations are required to make out a
conditions-of-confinement claim." 503 U.S. at 8-9, 112 S.Ct. at 1000. "Because routine
discomfort is 'part of the penalty that criminal offenders pay for their offenses against
society . . . only those deprivations denying 'the minimal civilized measure of life's
necessities' are sufficiently grave to form the basis of an Eighth Amendment violation.' "
However in "the excessive force context, society's expectations are different. When
prison officials maliciously and sadistically use force to cause harm, contemporary
standards of decency always are violated." *Id.* at 9, 112 S.Ct. at 1000.

Hudson v. Palmer, 468 U.S. 517, 526–527, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393

(1984).  "An express intent to inflict unnecessary pain is not required . . . and harsh

'conditions of confinement' may constitute cruel and unusual punishment unless such

conditions 'are part of the penalty that criminal offenders pay for their offenses against

society.' "  Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251

(1986), *quoting* Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251

(1976) and Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d

59 (1981).  The "Eighth Amendment prohibits punishments which, although not

physically barbarous, 'involve the unnecessary and wanton infliction of pain,' . . . which

includes an infliction of pain that is "totally without penological justification."  Rhodes v.

Chapman, 452 U.S. 337, 346-67, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981).

It has long been held that "a prison official cannot be found liable under the

Eighth Amendment for denying an inmate humane conditions of confinement unless the

official knows of and disregards an excessive risk to inmate health or safety; the official

must both be aware of facts from which the inference could be drawn that a substantial

risk of serious harm exists, and he must also draw the inference."  Farmer v. Brennan,

511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *see also* LaMarca v.

Turner, 995 F.2d 1526, 1535 (11th Cir. 1993), *cert. denied*, 510 U.S. 1164 (1994).

Because "only the unnecessary and wanton infliction of pain implicates the Eighth

Amendment," a prison official must have a "sufficiently culpable state of mind" to violate

the Cruel and Unusual Punishments Clause.  Farmer, 511 U.S. at 834, 114 S.Ct. at

1977 (internal quotation marks, emphasis, and citations omitted).  "[I]n both prison

conditions and medical needs cases, the relevant state of mind for purposes of liability

is deliberate indifference." Thomas, 614 F.3d at 1304; *see also* Farmer, 511 U.S. at 834, 114 S.Ct. at 1977; Wilson v. Seiter, 501 U.S. 294, 302-03, 111 S.Ct. 2321, 2326, 115 L.Ed.2d 271 (1991). With respect to the deliberate indifference component, Defendants contend that Plaintiff "cannot demonstrate that the Defendants were deliberately indifferent . . . ." Doc. 98 at 16-17.

In analyzing Plaintiff's claims, it is helpful to summarize the evidence presented in chronological order. It is undisputed that Plaintiff entered the custody of the Department of Corrections on October 21, 2008, and arrived at Madison C.I. in November of 2008. Plaintiff was issued a pair of size 15 boots, but neither Defendant is responsible for giving Plaintiff those boots.

The undisputed evidence in this case further reveals that Plaintiff was given a pass for a size 16 regular width boot on January 26, 2009, signed by Physicians Assistant Mosley. Plaintiff disputes that he was provided the proper size and said Defendant Bozeman issued him boots (in October 2009) that were too small. However, the medical records for December 30, 2009, show Plaintiff had calluses on the tips of his toes due to wearing small boots, which was indicated as size 16. Thus, at some point, Plaintiff was provided size 16 boots after issuance of the January 26, 2009, pass and the boots were provided to Plaintiff by Defendant Bozeman.

By March of 2009, Plaintiff is complaining of foot pain, and in July of 2009, Plaintiff's medical records note that he has thick toenails and a fungus, for which he receives medication. In October, the records note his thick, dark toe nail was growing out, the onychomycosis was improving, and he continued to receive medication. In December, the medical records note that Plaintiff had black toes which were extremely

hardened and calloused. It is undisputed that on December 30, 2009, Ms. Mosley writes another medical pass for Plaintiff to have larger, size 17 regular width boot.[33] It is also undisputed that Defendant Bozeman never obtained a size 17 regular width boot for Plaintiff.

Plaintiff's evidence is that Defendant Bozeman knew that Plaintiff had a medically issued pass for specific boots but "refused to honor" the pass and, instead, issued Plaintiff boots that were too big, size 18-EEE. When Plaintiff advised Defendant Bozeman of the error, Defendant Bozeman "ordered Plaintiff to 'try them out' " and told Plaintiff that was all that could be obtained. Plaintiff presented evidence, however, showing that the proper size boots were available[34] and, indeed, Plaintiff's PRIDE supervisor was able to obtain the correct size boots for him.

Plaintiff also demonstrated a genuine dispute of fact by showing that Defendant Bozeman was contacted by telephone by Physicians Assistant Mosley about Plaintiff's need for the boots. When Plaintiff gave Defendant Bozeman a copy of that pass, he contends Defendant Bozeman threatened him with disciplinary action and still refused to provide him with the proper boots.

There is evidence that sometime after January of 2010, Plaintiff obtained a second pair of boots. Plaintiff's evidence is that when Defendant Bozeman discovered Plaintiff had another pair of boots, he directed Plaintiff to choose between a size 18-

---

[33] That Ms. Mosley issued Plaintiff a pass for larger, size 17 boots supports the conclusion that at least at some point, Plaintiff was provided size 16 boots; otherwise, the records would presumably note that Plaintiff was not given the size listed in the January 26, 2009, pass and there would be no need for a larger size.

[34] Defendant Bozeman's response to an interrogatory acknowledged that it was possible to obtain Plaintiff's boot size as designated on the pass.

EEE pair of boots or a size 16-EEE pair. Notably, however, Plaintiff stated in his deposition that he had been given a pair of size 17 regular boots by Messrs. Byrd and Vaugh from PRIDE at some point "after January of 2010." However, after Plaintiff submitted grievances concerning his need for proper fitting boots, it is undisputed that Defendant Young directed that Plaintiff's boots be taken away and he be issued canvas shoes instead. Defendant Bozeman seized Plaintiff's boots pursuant to that direction.

There is undisputed evidence that on April 20, 2010, Plaintiff was once again discovered with a pair of size 17, regular boots. At this point, Defendant Bozeman allowed Plaintiff to keep the boots until July 29, 2010, when Plaintiff was transferred away from Madison C.I. It is undisputed that Plaintiff was transferred wearing "Bobos" but was eventually provided boots at Avon Park C.I., although they were once again, an improper size 18-EEE boot.

**Defendant Bozeman**

Because the evidence reveals that Plaintiff was provided size 16 boots as directed in January 2009, Defendant Bozeman cannot be held liable for complying with the first pass. Furthermore, Defendant Bozeman is also not liable for the fact that Plaintiff was wearing size 15 boots prior to January 2009 because there is no evidence that Defendant Bozeman gave Plaintiff those boots. To be clear, Plaintiff's claims against Defendant Bozeman must be limited to events which transpired after issuance of the second pass on December 30, 2009. So limited, Plaintiff is unable to show a genuine dispute of fact concerning Defendant Bozeman's failure to provide Plaintiff with the correct boots following the December 30, 2009, pass because Plaintiff did not suffer sufficient harm.

Considering the evidence in the light most favorable to Plaintiff, he demonstrated that despite knowledge of the need for a specific sized boot, a need recognized by a medical professional, Defendant Bozeman improperly and intentionally gave Plaintiff a size 18-EEE boot, despite his ability to comply with the medical directive. However, the medical records show that the harm to Plaintiff (thick toe nails, black toes, severely hardened, calloused toes) occurred in 2009. On January 29, 2010, it was noted that Plaintiff had "good sensation" in his feet, and there is no evidence of further trips to sick call for problems with Plaintiff's feet. While Plaintiff did submit an informal grievance in February 2010 complaining of blisters from boots that were too large, that is the only evidence of harm suffered by Plaintiff at Madison C.I. following the December 2009 pass.

To violate the Eighth Amendment in a conditions of confinement claim, Plaintiff must show both the subjective and objective elements. Plaintiff has created a genuine issue of fact indicating the subjective element of the claim. Plaintiff submitted evidence that Defendant Bozeman intentionally failed to provide him proper boots despite knowledge of a medical pass requiring the same. However, Plaintiff has not met the objective showing because he has not demonstrated an injury that is "sufficiently serious" to constitute a denial of the "minimal civilized measure of life's necessities." It may be assumed that knowingly requiring a prisoner to wear boots that are too small could inflict a great deal of pain that is "totally without penological justification." Yet wearing boots too big has not been shown by Plaintiff to cause any more harm than blisters. Blisters are too insignificant to violate the Eighth Amendment.

Plaintiff's argument throughout this case, to be sure, is to claim that after his boots were confiscated when he was transferred on July 29, 2010, he fell and suffered serious injury. That claim cannot be placed on these Defendants, however, because of intervening events. Plaintiff arrived at Avon Park C.I. and an official there issued Plaintiff size 18 boots while the proper size was ordered. If the boot size was *any* factor in Plaintiff's fall, it is not attributable to Defendants Bozeman or Young. Summary judgment should be granted in favor of Defendant Bozeman on Plaintiff's Eighth Amendment claim.

### Defendant Young

Although Plaintiff has created a dispute of fact concerning Defendant Young's decision to take away Plaintiff's boots and give him canvas shoes, that fails as an Eighth Amendment claim for the same reason Plaintiff's claim fails against Defendant Bozeman. Plaintiff did not demonstrate the objective prong because he did not show a sufficiently serious harm. In a conditions of confinement case, only "extreme deprivations" are sufficient and Plaintiff did not sufficient sufficiently serious harm. Summary judgment should be granted in favor of Defendant Young on the Eighth Amendment claim as well.

### B.  First Amendment claim

"It is well established that a prisoner's constitutional rights are violated if adverse action is taken against him in retaliation for the exercise of his First Amendment rights." Pate v. Peel, 256 F.Supp.2d 1326, 1336 (N.D. Fla. 2003), *citing* Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003); Mitchell v. Farcass, 112 F.3d 1483, 1490 (11th Cir. 1997); Wright v. Newsome, 795 F.2d 964 968 (11th Cir. 1986); Adams v. James, 784

F.2d 1077, 1080 (11th Cir. 1986). It has long been held that prison officials may not infringe on an inmate's First Amendment right to petition the government for a redress of his grievances with a practice that is "not reasonably related to legitimate penological objectives" or take certain actions "with the intent of chilling that First Amendment right." Harris v. Ostrout, 65 F.3d 912, 916 (11th Cir. 1995), *citing* Turner v. Safley, 482 U.S. 78, 85-89, 107 S.Ct. 2254, 2260-61, 96 L.Ed.2d 64 (1987), and Wildberger v. Bracknell, 869 F.2d 1467, 1468 (11th Cir. 1989); *see also* Pate, 256 F.Supp.2d at 1336. Inmates exercise their "First Amendment right of freedom of speech when" they complain about the conditions of their confinement through the filing of grievances. Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008), citing Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003). Retaliation in the prison setting may be established by demonstrating (1) constitutionally protected speech by an inmate; "(2) the inmate suffered adverse action such that the [official's] allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action . . . and the protected speech [the grievance]." O'Bryant v. Finch, 637 F.3d 1207, 1212 (11th Cir. 2011), *quoting* Smith, 532 F.3d at 1276.

There is no dispute that Plaintiff engaged in protected First Amendment activity when he submitted grievances. As for the second and third elements, Defendants contend that Plaintiff only "raises a presumption of retaliatory conduct" and there is insufficient evidence to support this claim. Doc. 98 at 20. Defendant Young points out that he did not decide that Plaintiff's job should be changed, but he nevertheless contends that "if he had been on the ICT, he would have changed [Plaintiff's] job assignment due to the appearance of impropriety." *Id.* Additionally, it is argued that

Plaintiff "continued to show dissatisfaction even though he was issued multiple pairs of boots" and, thus, it was proper for staff "to attempt an alternative route in order to find footwear" for Plaintiff.  *Id.*

Plaintiff has come forward with evidence showing that Defendant Young signed the two formal grievances in which Plaintiff complained about his ill-fitting shoes. Defendant Young adopted the recommendation provided to him in the second grievance, and Defendant Young is the official responsible for the decision rendered in that grievance.  Plaintiff has raised a genuine dispute with Defendant Young's assertion that the decision to remove Plaintiff from his job with PRIDE was made by the ICT. Doc. 104 at 19.  Plaintiff points out that Defendant Young responded to the grievance on March 30, 2010, which was two days before the ICT meeting.  *Id.* at 19-20.  The response by Defendant Young stated "that after all your complaints about the state boots not fitting or not being good enough, a pair of State tennis shoes (size 17) will be issued to you and not boots."  Doc. 98-9 at 7.  The response then stated: "Due to the change in shoes, you will be receiving a job change that does not require you to wear boots."  *Id.*  Thus, Plaintiff points out that Defendant Young made the decision to remove Plaintiff from PRIDE two days before the ICT met.

Plaintiff further suggests that contrary to Defendants' assertion that he had a poor job performance at PRIDE, Plaintiff had "been given a promotion by Mr. Byrd" and had an "outstanding job performance at PRIDE."  Plaintiff suggests that the reasons asserted for Plaintiff's removal from PRIDE and the taking of his boots are "a ruse" for retaliation.  Plaintiff points out that he had a valid medical pass for boots and notes that Defendant Young never sought medical approval to cancel Plaintiff's pass.

Plaintiff has raised a dispute concerning the fact that although he had a medical pass, Defendant Young intentionally directed that boots be taken away from Plaintiff, that Plaintiff be given canvas shoes, and that he no longer work for PRIDE. Those are adverse consequences to Plaintiff.[35] Plaintiff has created a dispute as to the retaliation claim and has shown that he suffered adverse action and that the action had a causal relationship to his grievances. Defendant Young's summary judgment motion should be denied as to the retaliation claim. However, because no evidence has been presented which demonstrates that Defendant Bozeman retaliated against Plaintiff because of grievances, summary judgment should be granted in favor of Defendant Bozeman.

**Qualified Immunity**

Defendant Young asserts entitlement to qualified immunity. However, it has long been established that adverse action cannot be taken against a prisoner as retaliation for the exercise of his First Amendment rights. Wright v. Newsome, 795 F.2d 964 968 (11th Cir. 1986); Adams v. James, 784 F.2d 1077, 1080 (11th Cir. 1986); Mitchell v. Farcass, 112 F.3d 1483, 1490 (11th Cir. 1997); Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003). Defendant Young is not entitled to qualified immunity on the retaliation claim.

---

[35] Plaintiff stated that after Defendant Young directed that his work boots be taken, Defendant Bozeman took his work boots on March 31, 2010. Doc. 104 at 19. However, Plaintiff then stated that "PRIDE immediately found" Plaintiff another pair of boots so he would not lose his job at PRIDE. Doc. 104 at 19. That explains Plaintiff's later statement that when he went before the ICT, he advised that he still had his boots, he had no further problems, and wanted to continue working for PRIDE. Id. at 22.

**Damages**

Defendants contend that Plaintiff is barred from seeking compensatory or punitive damages pursuant to 42 U.S.C. § 1997e(e). Because there is no physical injury to Plaintiff as a result of the surviving First Amendment claim, Plaintiff's request for monetary damages must necessarily be limited to nominal damages. 42 U.S.C. § 1997e(e). Harris v. Garner, 216 F.3d 970 (11th Cir. 2000)[36], *reinstating in part* 190 F.3d 1279 (11th Cir. 1999); Osterback v. Ingram, et al., No. 00-10558, 263 F.3d 169 (11th Cir. 2001) (Table). However, Plaintiff may seek nominal damages for that claim.

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendants' motion for summary judgment, doc. 98, be **GRANTED** as to Plaintiff's Eighth Amendment claims and the First Amendment claim against Defendant Bozeman, that the request for damages be limited to nominal damages only pursuant to § 1997e(e), but that the motion be otherwise **DENIED**. It is further **RECOMMENDED** that this case be **REMANDED** for further proceedings on the surviving First Amendment retaliation claim against Defendant Young.

**IN CHAMBERS** at Tallahassee, Florida, on September 5, 2013.


 S/    Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

---

[36] Harris v. Garner, 190 F.3d 1279 (11th Cir. 1999) was vacated by 197 F.3d 1059, and the Opinion Reinstated in Part on Rehearing by 216 F.3d 970 (11th Cir. 2000), *cert. denied* 121 S. Ct. 2214 (2001). The parts of the panel opinion relevant to this legal issue were reinstated.

## NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.